**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:12-cv-00311-MR-DLH**

**ROBIN L. HARRIS, Individually and** )
**as Executrix of the Estate of Billy** )
**David Harris, deceased,** )
         )
           **Plaintiffs,** )
         )   **MEMORANDUM ORDER**
     **vs.** )      **AND OPINION**
         )
**AJAX BOILER, INC., et al.,** )
         )
           **Defendants.** )
_____ )

**THIS MATTER** is before the Court on the summary judgment motions

filed by four defendants to this proceeding, to wit: Crane Co., individually

and as successor-in-interest to both National U.S. Radiator and Pacific

Steel Boiler (herein "Crane Co."); Cleaver-Brooks, Inc., individually and as

successor-in-interest to both Aquachem and Nebraska Boiler Division

(herein "Cleaver-Brooks); Riley Power, Inc., individually and as successor-

in-interest to Babcock Borsig Power, Inc., Riley Stoker Corporation, and

D.B. Riley (herein "Riley"); and Trane U.S. Inc., individually and as

successor-in-interest to both American Standard, Inc., and American

Radiator and Standard Sanitary Corporation (herein "Trane"). [Docs. 146; 149; 151; 156].[1]

Plaintiff Robin L. Harris, individually and as the Administrator of the Estate of Billy David Harris ("Harris"), brings this diversity action asserting five claims for relief in her Amended Complaint. [Doc. 78]. All Plaintiff's claims center upon Harris having contracted mesothelioma from breathing asbestos dust and later dying as a result thereof. [Id. at 1-2]. Count One alleges negligence [Id. at 5-9], Count Two alleges breach of implied warranty [Id. at 9], Count Three alleges gross negligence [Id. at 10-11], Count Four alleges false representation [Id. at 12], and Count Five alleges failure to warn [Id. at 12-15]. All of Plaintiff's five claims are brought pursuant to North Carolina's products liability law.

The four defendants discussed herein have moved the Court for summary judgment on all claims. For the reasons that follow, the Court will grant summary judgment as to these four defendants.

---

[1] Defendant Georgia-Pacific LLC, individually and as successor-in-interest to Georgia Pacific Corporation (herein "Georgia-Pacific"), filed a motion for summary judgment in this matter as well. [Doc. 154]. The Court has resolved Georgia-Pacific's summary judgment motion by separate order.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists. Id. Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-

movant as well.  <u>Adams. v. UNC Wilmington</u>, 640 F.3d 550, 556 (4th Cir. 2011).

## FACTUAL BACKGROUND

The forecast of evidence, in the light most favorable to the Plaintiff, is as follows.  Billy David Harris was diagnosed with malignant mesothelioma on or about October 21, 2011, and died from the disease on January 12, 2013. [Doc. 78 at 3].  Mr. Harris worked manual labor jobs where he was exposed to asbestos.  [Id. at 4].  His work in the industrial trade placed him around asbestos insulating materials which can release asbestos dust into the air under certain conditions.  [Id.].  As relevant here, Harris' industrial employment included working for Cooks Insulation Co., Inc. (herein "CICI"), as an insulator helper rehabilitating steam boilers at various commercial sites.  [Doc. 157-2 at 3-5].

Harris was employed by CICI for 18 months from approximately 1974 to 1976.  [Doc. 148-1 at 2].   Harris was supervised by fellow CICI employee Bob Greene.  [Doc. 150-2 at 17].  Greene, as Harris' supervisor, worked for CICI some years before Harris was hired and instructed Harris regarding job tasks.  [Doc. 151-1 at 3].  Greene would pick up Harris each morning before work and take him home at night following the day's labor.  [Doc. 150-2 at 17-19].   Greene also brought all of the equipment and

materials to the job sites where the two men worked. [Id.]. According to Harris' deposition testimony, his job as an insulator helper exposed him to asbestos dust due to his "chipping the mud on and off in the firebox [of a boiler] and mixing up the – the mud in the wheelbarrow and stuff, because it was real dusty and stuff." [Doc. 148-1 at 2]. The "mud," Harris stated, was castable cement containing asbestos fibers sold under the brand name "Narcolite"[2] and was the only "mud" Harris ever used. [Id. at 7].

The four named defendants herein are, and are the successors-in-interest to, commercial boiler manufacturers. During his eighteen-month employment with CICI, Harris estimated that he worked on a total of 70-80 boilers of various brands. [Doc. 157-2 at 7-8]. Of the boilers Harris serviced, Harris testified that he and Greene worked on American Standard, Crane, Riley, and Cleaver-Brooks boilers while employed by CICI. [Doc. 150-2 at 8, 10]. Harris' deposition testimony revealed that his work on these four brands of boilers was consistent in many ways.

Harris recalled working on American Standard boilers because of seeing an American Standard name plate affixed to them. [Doc. 165-1 at 7

---

[2] Narcolite was manufactured by the North American Refractories Company (NARCO) from 1961 to 1977 and contained 2% chrysotile asbestos. [Doc. 165-7 at 4-5, 9]. This product was sold in 50 pound bags as a powdered cement composite that required mixing with water before application. [Doc. 165-5 at 17 (pp.115-116)].

(p.24)].   He testified that he probably worked on "more than ten" American Standard boilers and that his job was to chip the mud out of the internal firebox "and clean it – clean it out, scrape it out and re-mud it."  [Id. (p.22)]. With regard to the process of "re-mudding," Harris testified, "[w]e would usually take a wheelbarrow and just dump [the Narcolite] out in there, which it would be very dusty, and mix it up.  And either me or Bob, one, would get in there and put the mud back in there on it." [Id.  at 7 (p.22)]. Harris stated he performed his tasks at the direction of Greene because "Bob [ ] had manuals that he knew how to do it, and I would just do whatever he told me to do."  [Id.  at 8 (p.27)].  Generally speaking, it took Harris and Greene one day to chip off old mud and apply new mud to complete a boiler service call.  The longest it ever took the men to service a boiler was two to three days.  [Doc. 148-1 at 5].  Harris performed boiler rehabilitation work two to three days per month over the eighteen months he was employed by CICI.   [Id.].

Similar to his estimate regarding American Standard boilers, Harris testified that he worked on eight to ten [Doc. 150-2 at 12] Cleaver-Brooks boilers, eight to ten [Doc. 148-1 at 8] Crane boilers, and eight to ten [Doc. 151-2 at 101-102] Riley boilers while at CICI.  Further, Harris followed the same chipping and remudding protocol he described was necessary to

overhaul American Standard boilers when he refurbished Cleaver-Brooks and Crane boilers, but not Riley boilers. [Doc. 165-1 at 8 (pp.29-32); at 8-9 (pp.32-36)]. When it came to "chipping and remudding" Riley boilers, Harris' task was performed distinctly differently. Harris' renovation of the three brands of boilers other than Riley consisted of revamping and resealing those boilers' internal fireboxes. In contrast, Harris stated he worked on the exterior of Riley boilers and described this process in the following manner: "Yeah, we – the – they were a little different. We would put mud on the outside of it with chicken wire and then put the metal on over the top of that." [Id. at 10 (p.37)]. In short, Harris used Narcolite as an *internal* refractory sealing agent within the fireboxes of American Standard, Crane, and Cleaver-Brooks boilers, and as an *external* insulating compound on Riley boilers. For this reason, the Court will discuss the motions filed by Trane, Crane Co., and Cleaver-Brooks first followed by the motion filed by Riley.

# DISCUSSION[3]

A.     <u>American Standard, Cleaver-Brooks, and Crane Boilers</u>.

Plaintiff asserts that the defendants' summary judgment motions should be denied because she has provided a sufficient forecast of evidence that "might affect the outcome of the case." <u>N&O Pub. Co.</u>, 597 F.3d at 576.  In particular, Plaintiff asserts as salient facts that, during his employment with CICI as an insulator's helper servicing boilers, "Mr. Harris was exposed to asbestos when the old insulating cement, or 'mud,' was removed and when new insulating mud was mixed."  [Doc. 165 at 4]. Dissecting Plaintiff's assertion yields two theories of liability:  (1) the old mud Harris chipped off the boilers he refurbished contained asbestos and created asbestos dust which he inhaled and which caused his mesothelioma, and (2) the Narcolite he mixed and used to "re-mud" the boilers likewise contained asbestos and created asbestos dust which he inhaled and which caused his mesothelioma.  These theories are insufficient to survive summary judgment as to defendants Trane, Crane Co., and Cleaver-Brooks.

---

[3] The Court need not reach, and therefore does not address, the parties' arguments surrounding the applicability of the standard announced by the Fourth Circuit in <u>Lohrmann v. Pittsburgh Corning Corp.</u>, 782 F.2d 1156 (4th Cir. 1986).

The Court begins with the language of North Carolina's products liability statute. Whether a plaintiff alleges a cause of action for inadequate warning under N.C. Gen. Stat. § 99B-5 or inadequate design under § 99B-6, the focal point of each statute is the "product" under consideration. Further, the statutes require a prospective plaintiff to prove a product was unreasonably dangerous at the time it left the control of the manufacturer. Id., § 99B-5(a)(1); § 99B-6(a)(1). In a products liability action governed by North Carolina law, the legal question revolves around the dangerousness of a product at the time it enters commerce. In the present matter, Plaintiff asserts the defendants are liable for two unreasonably dangerous products that infected Harris: one product being the boilers Harris was instructed to repair, and the other product being the Narcolite he used to repair them.

As for the first unreasonably dangerous product under consideration – each American Standard, Crane, or Cleaver-Brooks boiler Harris fixed – Plaintiff contends the defendants are "liable for Mr. Harris' injuries because [their] repair manuals and engineering drawings confirm [they] incorporated, specified, and sold asbestos-containing cement, an integral and necessary component for [their] boilers to operate as intended[.]" [Docs. 164 at 3; 165 at 3; 168 at 3]. Since these boilers incorporated asbestos-containing cement as a part of their production, Plaintiff argues,

Harris contracted mesothelioma from the inhaled dust generated when he chipped off the original cement. The flaw in Plaintiff's argument, however, is that the record is devoid of any evidence that the original cement (mud) placed in the boilers by these manufacturers contained asbestos.

Other than the brand name, Harris could not identify the exact make and model of any American Standard [Doc. 173-1 at 5-6], Cleaver-Brooks [Doc. 150-3 at 8-10], or Crane [Doc. 148-2 at 3] boiler he repaired for CICI. Plaintiff's forecast of evidence contains no repair manuals, specification sheets, or engineering drawings relating to the specific type of boilers Harris serviced. As a result, the record before the Court lacks any factual basis showing Harris repaired boilers that incorporated asbestos-containing cement when they left their respective manufacturers. Plaintiff responds by asserting that, "[a]ccording to Mr. Harris, his co-worker, Bob Greene had manufacturers' manuals for each of the boilers they insulated." [Doc. 165 at 4]. From this statement, which the Court accepts as true for the present purposes, Plaintiff argues such manuals necessarily disclosed that each boiler Harris serviced left the factory containing asbestos, and that Greene necessarily told Harris so. In order to survive summary judgment, however, Plaintiff must present a forecast of *admissible* evidence. Md Hwy Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991).

None of Greene's manuals are a part of the record in this matter. So, there are no admissions of any party opponent. Additionally, any statements that Greene might have made to Harris concerning the contents of the manuals would be inadmissible hearsay. Finally, Harris conceded that he could not identify the exact model of any American Standard [Doc. 173-1 at 5-6], Cleaver-Brooks [Doc. 150-3 at 8-10], or Crane [Doc. 148-2 at 3] boiler he worked on. The various documentary exhibits that Plaintiff attributes to the defendants, and that she asserts establishes their boilers as purportedly containing or requiring asbestos, are not linked by Harris to any specific boilers he serviced. As such, Plaintiff's assertion that the boilers left their manufacturers with asbestos is merely conjecture. [4]

Were Plaintiff able to surmount the evidentiary issues encompassing Greene's statements, the presumed contents of the boiler manuals possessed by Greene, and any boiler specification documents attributable to defendants, her efforts would still be for naught. Assuming for the sake of argument that all boilers Harris serviced did contain asbestos at the time

---

[4] For example, Plaintiff's assertion that Cleaver-Brooks' corporate representative "admitted that some of its boilers contained asbestos-containing cement[,]" is of no moment. [Doc. 164 at 7]. While Cleaver-Brooks' representative testified that some of its boilers "may have" contained asbestos when manufactured [Doc. 164-17 at 11 (p.39)], Harris' inability to specifically identify any make and model of boiler he serviced exposes the fatal gap in Plaintiff's forecast of evidence.

of their manufacture, a fatal gap nevertheless exists in Plaintiff's forecast of facts: whether the mud Harris ultimately chipped out of those boilers was any product placed there by the manufacturer. Harris testified that, when called upon to "chip and remud" boilers during his employment with CICI, he never worked on the same boiler twice and he did not know the service history of any boiler he worked on. Harris did not know when the boilers were originally installed or by whom, nor whether any boiler he refurbished had previously been serviced. [Docs. 148-2 at 5-6; 150-3 at 10-11; 165-5 at 13-14 (pp.101-105); 157-3 at 15-16]. As a result, the trier of fact would be left to speculate whether the mud Harris chipped out of any boiler contained asbestos at all.[5] Such speculation, however, is an inadequate proxy for admissible facts showing what actually occurred.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]

Anderson, 477 U.S. at 252. Based upon the foregoing, the defendants have borne their initial burden of demonstrating the absence of a genuine issue of material fact. Bouchat, 346 F.3d at 522. Having made this

---

[5] In this same vein, Plaintiff's experts simply *assumed* the mud Harris chipped off the defendants' boilers contained asbestos. [Doc. 148-5 at 3-5].

showing, the burden shifts to the Plaintiff as the non-moving party to fulfill her obligation to demonstrate that a triable issue exists. This she has failed to do with respect to the mud Harris chipped from defendants' boilers. Plaintiff has provided no forecast of admissible evidence showing that the mud Harris chipped off of the defendants' boilers contained asbestos at the time Harris made his repairs, or that any such mud had been placed there by the manufacturing defendants.

As for the second unreasonably dangerous product under consideration – the Narcolite Harris mixed and applied to defendants' boilers – Plaintiff alleges the defendants are liable for Harris' injuries because "the use of asbestos-containing cement in the maintenance and repair of boilers was both specified and anticipated in order for the boiler to operate and function as intended." [Doc. 165 at 7]. From this premise, Plaintiff asserts that Harris' use of any asbestos-containing cement (i.e. Narcolite) in the refurbishment of defendants' boilers was required and, therefore, necessarily foreseeable to the defendants. Thus, they had a duty to warn Harris about the use of this unreasonably dangerous product, even though it was not defendants' product.

As stated previously, Plaintiff has presented no admissible evidence showing that Harris serviced any specific make and model boiler.

Therefore, Plaintiff has presented no forecast of evidence setting forth what materials or products were recommended or appropriate for use in the overhaul of any of the defendants' boilers. Plaintiff has no evidence to show that defendants' boilers required the use of an asbestos-containing cement, in general, or Narcolite in particular, to affect a proper repair. Plaintiff responds by contending that defendants had a specific duty to warn Harris against the use of Narcolite because it was foreseeable a repairman would use this asbestos-containing product. Plaintiff's evidentiary forecast, however, fails to set forth any facts showing that the defendants approved, required, or even mentioned Narcolite for use in their boilers. The Court, therefore, finds persuasive the Fourth Circuit's opinion in <u>Baughman v. Gen'l Motors Corp.</u>, 780 F.2d 1131 (4th Cir. 1986) on this issue.

The Court of Appeals in <u>Baughman</u>, interpreting South Carolina products liability law, was called upon to determine two issues: (1) whether a manufacturer of a product could be held liable when a defective after-market component part substituted into its product failed and caused injury, and (2) whether the manufacturer of the product had a duty to warn against the use of any defective after-market component part which later could be substituted into its product. 780 F.2d at 1132. Answering these two issues

in the negative, the Court held that attributing liability to a manufacturer under such conditions fell outside the boundary of the manufacturer's safety responsibilities.

The court began with the accepted legal principle that a manufacturer who incorporates a defective component part into its finished product and then places the finished product into the stream of commerce is liable for injuries caused by a defect in the component part.  Id.  This is so because a manufacturer has a duty to test and inspect the component part before incorporating it into its product.  The opposite of this corollary must also be true:

> While a manufacturer can be fairly charged with testing and warning of dangers associated with components it decides to incorporate into its own product, it cannot be charged with testing and warning against any of a myriad of replacement parts supplied by any number of manufacturers. The duty to warn must properly fall upon the manufacturer of the replacement component part.

Id. at 1133.  The rationale of Baughman is all the more applicable under North Carolina law since the relevant products liability statute speaks directly to a third party's modification or alteration of a product:

> No manufacturer or seller of a product shall be held liable in any product liability action where a proximate cause of the personal injury, death, or damage to property was either an alteration or modification of the product by a party other than the manufacturer or seller, which alteration or modification

occurred after the product left the control of such manufacturer or such seller[.]

N.C. Gen. Stat. § 99B-3(a).

Mr. Harris' use of Narcolite to rehabilitate boilers manufactured by defendants, in a light most favorable to Plaintiff, could have led to Harris contracting mesothelioma from breathing asbestos dust caused by mixing the Narcolite with water to create the mud he used to seal the boilers' fireboxes. However, Plaintiff has forecast no facts to indicate that Narcolite (or any asbestos-containing cement) was a component part of any of the defendants' boilers at the time of manufacture. Narcolite, therefore, was an after-market component substituted into the defendants' boilers by Harris. The liability resulting from Harris' use of Narcolite, therefore, must fall on the manufacturer of that unreasonably dangerous product and not upon the defendants herein.

B.    Riley Boilers.

Plaintiff asserts that Riley's summary judgment motion should be denied because she has provided a sufficient forecast of evidence that "might affect the outcome of the case." N&O Pub. Co., 597 F.3d at 576. Plaintiff's states Harris worked on about eight to ten Riley boilers during his employment with CICI. [Doc. 167 at 5]. Harris described Riley boilers as

being six feet wide and twenty feet long with a "Riley Stoker" name plate located on the front of the boiler. [Id. at 5-6]. To overhaul this brand of boiler, Greene directed Harris put Narcolite mud on the outside of the Riley boiler, place chicken wire over the mud, and then cover the mud/chicken wire layer with sheet metal. Harris was exposed to asbestos, Plaintiff contends, when he chipped old insulating mud from the outside of the Riley boilers. [Id. at 6]. According to Plaintiff's factual forecast, Harris testified that Greene knew to apply mud to the exterior of these boilers based on a Riley manual Greene had which also explained the layering process to complete the job and that Greene conveyed this information to Harris. [Id.].

In its motion for summary judgment, Riley advances two arguments. First, it contends Harris' description of what he identified as a Riley boiler does not, in fact, describe any product ever manufactured by Riley. Second, even assuming Harris serviced boilers manufactured by Riley, the manner in which he serviced these boilers by applying Narcolite mud to the *exterior* of the boiler constituted a misuse of the Narcolite and an improper alteration of or modification to the boiler. [Doc. 171]. The Court will address these two arguments in turn.

As discussed above, other than the brand name, Harris could not identify the exact make and model of any American Standard [Doc. 173-1

at 5-6], Cleaver-Brooks [Doc. 150-3 at 8-10], or Crane [Doc. 148-2 at 3] boiler he repaired for CICI. The evidence presented by Riley goes one step further and demonstrates that Harris actually misidentified as Riley boilers some other type of boiler Harris serviced. On this point, Riley offered the affidavit of J. Michael Smith, a retired Riley employee who is familiar with the specifications and product applications for materials used in the design, manufacture and erection of Riley boilers, including but not limited to refractory and insulation products. [Doc. 151-4]. While Harris testified that the Riley boilers he serviced were six feet wide by twenty feet long and round, Smith testified that Riley never made boilers fitting those dimensions. Smith stated Riley never made round boilers at all. Further, the smallest boiler Riley manufactured, according to Smith, was "at least 8 feet wide and 12 feet tall." [Doc. 154-4 at 4]. Finally, Smith stated, "Riley Stoker did not manufacture horizontal boilers such as those described by Mr. Harris. Riley Stoker's package boilers utilized vertical waterwall tubes." [Id.].

Riley filed Smith's Affidavit together with its Motion for Summary Judgment on May 15, 2014. [Docs. 151; 151-4]. Thereafter, Smith was deposed on June 3, 2014. [Doc. 171-1 at 2]. During his deposition, Smith reiterated that Riley never manufactured a boiler matching the shape and

size described by Harris. [Id. at 3]. On June 5, 2014, Plaintiff filed her Brief in Opposition to Defendant Riley Power's Motion for Summary Judgment. [Doc. 167]. Nowhere in Plaintiff's Brief does she address, let alone contest, Smith's testimony. It is uncontroverted that the boilers Harris described were not manufactured by Riley. Fed.R.Civ.P. 56(e)(2) (If a party fails to properly address another party's assertion of fact, the court may consider the fact undisputed for purposes of the motion).

Riley asserts, as its second argument, that Harris' application of Narcolite to the exterior of what Harris believed to be a Riley boiler would be a misuse of the Narcolite product as well as an impermissible alteration or modification of the boiler. See N.C. Gen. Stat. § 99B-3(a) (no manufacturer of a product shall be liable in any products liability action where the proximate cause of death was either an alteration or modification of the product by a party other than the manufacturer). Smith testified Riley did not specify the use of Narcolite or any other castable refractory product for use on the *exterior* of its boilers as an insulator. [Doc. 151-4 at 4]. A refractory product is one designed to maintain its strength at high temperature; it is not designed to provide a protective thermal barrier. Consequently, as stated by Smith, "[c]astable refractory products such as 'Narcolite' are not suitable for external insulation on boilers, and would only

be used on the interior of a Riley Stoker boiler in certain, specific applications." [Id.].

As with Riley's factual assertions regarding the dimensions of the boilers it produced, Plaintiff also has failed to address in her opposition brief Riley's evidence that Harris' application of Narcolite to the exterior of a Riley boiler was a misuse of Narcolite and an impermissible alteration or modification of the boiler. As such, these facts are undisputed for purposes of Riley's motion. Thus, the Court will grant Riley Power's summary judgment motion. Fed.R.Civ.P. 56(e)(3).

## CONCLUSION

Based upon the foregoing analysis, the Court concludes that Plaintiff's forecast of evidence, taken in the light most favorable to her as the non-moving party, is insufficient to establish a genuine dispute as to any material fact. Accordingly, the four named defendants herein are entitled to judgment as a matter of law, and therefore, should be dismissed from this action.

## ORDER

**IT IS, THEREFORE, ORDERED** that the defendants' Motions for Summary Judgment [Docs. 146; 149; 151; 156] are **GRANTED** and defendant Crane Co., individually and as successor-in-interest to both

National U.S. Radiator and Pacific Steel Boiler; defendant Cleaver-Brooks, Inc., individually and as successor-in-interest to both Aquachem and Nebraska Boiler Division; defendant Riley Power, Inc., individually and as successor-in-interest to Babcock Borsig Power, Inc., Riley Stoker Corporation, and D.B. Riley; and, defendant Trane U.S. Inc., individually and as successor-in-interest to both American Standard, Inc., and American Radiator and Standard Sanitary Corporation, are hereby **DISMISSED** from this matter.

      **IT IS SO ORDERED.**

Signed: July 3, 2014

Martin Reidinger
United States District Judge